## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LYDIA LOSCHIAVO, ALISON CHARLES, and RENAUD FOURNIER, Derivatively On Behalf Of The Lehman Brothers Savings Plan, | ) **Civil Action:** )  ) ) |
| Plaintiffs, | ) ) |
| vs. | ) **VERIFIED COMPLAINT** ) |
| FIDELITY MANAGEMENT TRUST COMPANY, and ERNST & YOUNG, | ) **JURY DEMANDED** ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| THE LEHMAN BROTHERS SAVINGS PLAN, | ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiffs Lydia Loschiavo, Alison Charles, and Renaud Fournier ("Plaintiffs"), derivatively on behalf of the Lehman Brothers Savings Plan (the "Plan"), covering substantially all employees of Lehman Brothers Holdings Inc. ("Lehman" or the "Company"), allege as follows:

### INTRODUCTION

1.     Plaintiffs bring this action derivatively on behalf of the Plan against Lehman's auditor, Ernst & Young ("E&Y"), for E&Y's negligence in conducting the audits of Lehman during the Relevant Period (defined below).  Plaintiffs also bring this action on behalf of the Plan for the breach of fiduciary duties by the Plan trustee, Fidelity Management Trust Company ("Fidelity" or the "Trustee"), for failing to preserve and maintain the assets of the Plan by failing to initiate an action on behalf of the Plan to recover losses caused by E&Y's negligently conducted audits of Lehman.

2.      From July 10, 2007 through and including September 15, 2008 (the "Relevant Period"), the Plan acquired and held shares of Lehman common stock ("Lehman Stock" or "Company Stock"), which was offered as one of the retirement saving options in the participant contribution component of the Plan.

3.      On January 29, 2008, Lehman reported record revenues and earnings of nearly $60 billion and more than $4 billion, respectively, for its fiscal year 2007.  Lehman's Stock traded as high as $65.73 per share during January 2008.  Less than eight months later, on September 12, 2008, Lehman's Stock closed under $4.00 a share, a decline of nearly 95% from its January 2008 value.  On September 15, 2008, Lehman sought Chapter 11 protection, in the largest bankruptcy proceeding ever filed.

4.      At all times relevant hereto, E&Y served as the auditor for Lehman and knew, or should have known, that: (a) Lehman's audited financial statements were materially inaccurate; (b) Lehman's Stock price was artificially inflated due to these materially inaccurate financial statements and, if the truth had been known, would trade well below the price at which it was then-trading; (c) Lehman's audited financial statements, as filed with the United States Securities and Exchange Commission (the "SEC"), were incorporated into the Plan's Summary Plan Description (the "SPD"); and (d) therefore, it was reasonably foreseeable that Lehman's materially inaccurate audited financial statements would be relied upon by Plan participants and beneficiaries.

5.      As a result of E&Y's negligence in conducting its audits of Lehman, the Plan suffered substantial losses, resulting in the depletion of millions of dollars from the retirement savings and anticipated retirement income of the Plan's participants.

6.      In a Report, dated March 11, 2010, Anton R. Valukas, the Examiner in the bankruptcy proceedings *In re Lehman Brothers Holdings Inc., et al.*, 08-13555 (JMP) (Bankr. S.D.N.Y.), who was appointed to investigate the Lehman collapse (the "Examiner"), concluded that Lehman utilized improper accounting machinations (described more fully below) to bolster its balance sheet.  Moreover, with respect to E&Y's culpability as Lehman's auditor during this period, the Examiner concluded that:

> ***sufficient evidence exists to support colorable claims against Ernst & Young LLP ("Ernst & Young") for professional malpractice*** arising from Ernst & Young's failure to follow professional standards of care with respect to communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings.

*Report of Anton R. Valukas, Examiner*, dated March 11, 2010, (the "Valukas Report"), at 1027 (footnotes omitted).

7.      On July 6, 2010, Plaintiffs made a demand on Fidelity to take action against E&Y to recover losses to the Plan caused by E&Y's negligently conducted audits of Lehman.

8.      To date, Fidelity has failed to take any action against E&Y in connection with E&Y's audits of Lehman and the resulting harm to the Plan.  Fidelity's failure to act constitutes a breach of the fiduciary duties it owes to the Plan to maintain and preserve Plan assets by enforcing the Plan's valid claims.

9.      Plaintiffs, therefore, bring this action derivatively, on behalf of the Plan, against E&Y for its negligence in conducting its audits of Lehman during the Relevant Period.  Plaintiffs also bring this action against Fidelity, pursuant to Section 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), for breach of the fiduciary duties Fidelity, as the Plan Trustee, owes to the Plan

10.     Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendant E&Y's possession, certain of Plaintiffs' allegations are by necessity based upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support Plaintiffs' claim.

## JURISDICTION AND VENUE

11.     *Subject Matter Jurisdiction.*  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l), as well as 28 U.S.C. § 1331.  In addition, this Court has supplemental jurisdiction over the state law negligence claim pursuant to 28 U.S.C. § 1367.

12.     *Personal Jurisdiction*.  Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because Defendants would be subject to the jurisdiction of a court of general jurisdiction in this District.

13.     *Venue*.  Venue is proper in this District because Defendant Fidelity maintains offices its corporate headquarters at 82 Devonshire Street, Boston, MA 02109-3614, and Defendant E&Y does business and maintains offices in this District at 200 Clarendon Street, Boston, MA 02116.

## PARTIES

**A.**    **Plaintiffs**

14.    ***Plaintiff Lydia Loschiavo*** ("Loschiavo") is a former Lehman employee and is, and at all relevant times was, a participant in the Plan.

15.    ***Plaintiff Alison Charles*** ("Charles") is a former Lehman employee and is, and at all relevant times was, a participant in the Plan.

16.    ***Plaintiff Renaud Fournier*** ("Fournier") is a former Lehman employee and is, and at all relevant times was, a participant in the Plan.

**B.**    **Defendant Fidelity**

17.    Defendant Fidelity is, and during the Relevant Period was, the trustee for the Plan with the exclusive authority and discretion to manage and control the Plan's assets.  ERISA § 403(a), 29 U.S.C. § 1103(a).  As such, Fidelity was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

**C.**    **Defendant E&Y**

18.    Defendant E&Y served as Lehman's independent auditor during the Relevant Period.  E&Y audited Lehman's fiscal 2007 financial statements, falsely certified that those financial statements were prepared in accordance with the generally accepted accounting principles ("GAAP"), and falsely represented that it conducted its audits or reviews in accordance with the generally accepted auditing standards ("GAAS").  E&Y also reviewed Lehman's interim financial statements during the Relevant Period and falsely represented that no material modifications needed to be made for them to conform with GAAP.

**D.**     **Nominal Defendant**

19.     The Plan is an employee pension benefit plan, as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Specifically, the Plan is a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  The Plan is not a party in an action such as this. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.

20.     The Company Stock Fund is one of the investment options available for Plan participants.  In its 2007 Form 11-K, filed on June 26, 2008, Lehman reported that the Plan had approximately $228,691,000 invested in the Company Stock Fund as of December 31, 2007, when Company Stock was trading at $65.44 per share.

<b>FACTUAL BASIS OF DEFENDANT E&Y's NEGLIGENCE</b>

21.     Lehman provided a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.  The Company's worldwide headquarters in New York, and regional headquarters in London and Tokyo, were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region. Through its subsidiaries, the Company was a global market-maker in all major equity and fixed income products.

22.     Beginning in the second half of 2007, Lehman employed off-balance sheet devices, known within Lehman as "Repo 105" and "Repo 108" transactions, to temporarily remove securities inventory from its balance sheet, usually for a period of seven to ten days.  The purpose of the off-balance sheet accounting device was to create a materially misleading picture of the firm's financial condition during the second half of 2007 and 2008.

23.     Sale and repurchase agreements ("repos") are agreements where one party transfers an asset or security to another party as collateral for a short-term borrowing of cash, while simultaneously agreeing to repay the cash and take back the collateral at a specific point in time.  When the repo transaction matures, the borrower repays the funds plus an agreed upon interest rate and takes back its collateral.  Over-collateralization amounts, or haircuts, in Repo 105 and Repo 108 transactions were higher than the typical haircut applied to ordinary repos using similar securities.

24.     Lehman's Repo 105 and Repo 108 transactions were nearly identical to standard repurchase and resale transactions (borrowing transactions) that Lehman and other investment banks used to secure short-term financing, with a critical difference:  ***Lehman accounted for Repo 105 and Repo 108 transactions as "sales" as opposed to financing transactions***.  This accounting treatment was in contravention of GAAP as articulated in Statement of Financial Accounting Standards ("SFAS") 140.

25.     By recharacterizing the Repo 105 and 108 transactions as "sales," Lehman removed the securities inventory from its balance sheet.

26.     For purposes of this complaint, "Repo 105" and "Repo 108" transactions are hereinafter collectively referred to as "Repo 105" transactions because Lehman treated the two transactions identically under the same internal accounting policy and both transactions shared the same anatomy.  They differed only in that Repo 105 transactions utilized fixed income securities and required a minimum five percent over-collateralization amount (*i.e.*, a minimum of $105 worth of securities in exchange for $100 cash borrowed), while Repo 108 transactions utilized equity securities and required a minimum eight percent over-collateralization amount (*i.e.*, a minimum of $108 worth of securities in exchange for $100 cash borrowed).

27.     In an effort to conceal the leverage risk associated with an investment in Lehman Stock from credit rating agencies and investors, including Plan participants, Lehman regularly increased its use of Repo 105 transactions in the days prior to reporting periods to reduce its publicly reported net leverage and balance sheet.  The concealment was effected by Lehman's non-disclosure of the cash borrowings from its Repo 105 transactions in its public filings, including its filings with the SEC on Form 10-K and Forms 10-Q during the Relevant Period.  In this regard, although Lehman had borrowed tens of billions of dollars in these transactions, Lehman did not disclose the borrowings or the obligation to repay the debt.  Instead, Lehman accounted for the Repo 105 transactions as "sales" of securities and used the cash from the Repo 105 transactions to pay down other liabilities, thereby reducing both the total liabilities and the total assets reported on its balance sheet.  This resulted in a decrease in Lehman's reported leverage ratios.

28.     Moreover, to conceal this fraudulent accounting, Lehman affirmatively misrepresented in its financial statements during the Relevant Period that it treated all repo (including Repo 105 transactions) as financing transactions, not sales, for financial reporting purposes.  The misrepresentations were material as evidenced by the fact that Lehman undertook $31.9 billion, $36.4 billion, $38.6 billion, $49.1 billion, and $50.38 billion of Repo 105 transactions at the quarters ended May 31, 2007, July 31, 2007, November 30, 2007, February 29, 2008, May 31, 2008, respectively.  Cash from Repo 105 transactions was used to pay business expenses and to pay off other liabilities, including short-term liabilities, thereby reducing reported leverage.

29.     A few days after the new quarter began, Lehman would borrow the necessary funds to repay the Repo 105 cash borrowings plus interest, repurchase the securities, and restore

the assets to its balance sheet.

30.     Lehman never publicly disclosed its use of Repo 105 transactions, its accounting treatment for these transactions, the considerable escalation of its total Repo 105 usage in late 2007 and into 2008, or the material impact these transactions had on the firm's publicly reported net leverage ratio.  Instead, Lehman affirmatively misrepresented in its financial statements that the firm treated all repo transactions (including Repo 105 transactions) as financing transactions, not sales for financial reporting purposes. The Notes to Lehman's Consolidated Financial Statements for each period stated that Lehman treated "[r]epurchase and resale agreements" as "collateralized agreements and financings for financial reporting purposes."  They further stated that "[o]ther secured borrowings principally reflect transfers accounted for as financings rather than sales under SFAS 140."

31.     Lehman failed to disclose its Repo 105 practice even though Martin Kelly, Lehman's Global Financial Controller advised Erin Callan ("Callan"), the Company's CFO and Executive Vice President, "that the only purpose or motive for the transactions was reduction in balance sheet" and believed that "there was no substance to the transactions."

32.     Unbeknownst to rating agencies, Government regulators, and the investing public (including Plan participants), Lehman reverse engineered its net leverage ratio for public consumption.  Notably, during Lehman's 2008 earnings calls in which it touted its leverage reduction, analysts frequently inquired about the means by which Lehman was reducing its leverage.  Although Callan told analysts that Lehman was "trying to give the group a great amount of transparency on the balance sheet," and she reported that Lehman was reducing its leverage through the sale of less liquid asset categories, she said nothing about Lehman's use of Repo 105 transactions to fraudulently manage Lehman's reported financial position.

33.     As Lehman's independent auditor, and for the reasons set forth herein, E&Y was fully aware of: (1) Lehman's improper use and nondisclosure of the Repo 105 accounting transactions; (2) the false and misleading effect such transactions had on Lehman's financial statements, including the distortion of leverage ratios; (3) the fact that Lehman's stock price reflected the information contained in Lehman's audited financial statements; and (4) the fact that Lehman's audited financial statements (as filed with the SEC) were incorporated by reference into the Plan's SPD and, therefore, relied upon by Plan participants.

34.     In order for any repo transferor (including a Repo 105 transferor) to be deemed to have surrendered control of an asset under GAAP (SFAS 140), so as to achieve true sale treatment under SFAS 140, the transferred assets must be isolated from the transferor and put presumptively beyond the reach of the transferor and its creditors, even in the event of the transferor's bankruptcy.  Thus, to be isolated under SFAS 140, there must have been a true sale at law.  When there is a question whether or not a true sale has occurred, the transferor will usually obtain a "true sale" legal opinion letter.

35.     Lehman's internal Repo 105 Accounting Policy echoed the SFAS 140 requirement that the "transaction [be] a true sale at law."  However, Lehman was unable to obtain a "true sale" opinion letter from a United States lawyer.  As stated in Lehman's Repo 105 Accounting Policy:  "We generally cannot obtain a true sale opinion under U.S. Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140, par 9.a Statement of Financial Accounting Standards ('SFAS') 140."

36.     Therefore, Lehman obtained a "true sale" opinion from the Linklaters law firm in London, based upon the laws of the United Kingdom.  E&Y accepted this letter as evidence of a

"true sale" under U.S. law.

37.     On July 10, 2007, E&Y issued a "Report of Independent Registered Public Accounting Firm" to "The Board of Directors and Stockholders of Lehman Brothers Holdings Inc."  This report, which was reproduced in Lehman's Form 10-Q for the quarterly period ended May 31, 2007 as filed with the SEC on July 10, 2007, stated:

> We have reviewed the consolidated statement of financial condition of Lehman Brothers Holdings Inc. and subsidiaries (the "Company") as of May 31, 2007, and the related consolidated statement of income for the three and six month periods ended May 31, 2007 and 2006 and the consolidated statement of cash flows for the six month periods ended May 31, 2007 and 2006. These financial statements are the responsibility of the Company's management.

> We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

> Based on our review, we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2006, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended and in our report dated February 13, 2007, we expressed an unqualified opinion on those consolidated financial statements.

38.     For the reasons set forth above, E&Y did not conduct its review in accordance with the standards of the Public Company Accounting Oversight Board.  Moreover, because E&Y knew Lehman's SEC filings were incorporated into the Plan's documents, E&Y intentionally provided false "negative assurance" to Plan participants by stating "we are not aware of any material modifications that should be made to the consolidated financial statements

referred to above for them to be in conformity with U.S. generally accepted accounting principles."

39.   This assurance was false when made and resulted in Plan participants and beneficiaries believing that Lehman Stock was properly valued, which it was not.

40.   On October 10, 2007, E&Y issued a "Report of Independent Registered Public Accounting Firm" to "The Board of Directors and Stockholders of Lehman Brothers Holdings Inc."  This report which was reproduced in Lehman's Form 10-Q for the quarterly period ended August 31, 2007 as filed with the SEC on October 10, 2007, stated:

> We have reviewed the consolidated statement of financial condition of Lehman Brothers Holdings Inc. and subsidiaries (the "Company") as of August 31, 2007, and the related consolidated statement of income for the three month and nine month periods ended August 31, 2007 and 2006, and the consolidated statement of cash flows for the nine month periods ended August 31, 2007 and 2006. These financial statements are the responsibility of the Company's management.

> We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States).  A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters.  It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

> Based on our review, we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2006, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended and in our report dated February 13, 2007, we expressed an unqualified opinion on those consolidated financial statements.

41.   E&Y was negligent in issuing its October 10, 2007 report for the reasons specified in paragraph 38 above.

42.     On January 28, 2008, E&Y issued two Reports "of Independent Registered Public Accounting Firm" to "The Board of Directors and Stockholders of Lehman Brothers Holdings Inc." These reports, which were reproduced in Lehman's Form 10-K for the fiscal year ended November 30, 2007 as filed with the SEC on January 29, 2008, stated:

> We have audited Lehman Brothers Holdings Inc.'s (the "Company") internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Assessment of Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also,

projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of November 30, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007 of the Company and our report dated January 28, 2008 expressed an unqualified opinion thereon.

                              *        *        *

We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Holdings Inc. (the "Company") as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control

> over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 28, 2008 expressed an unqualified opinion thereon.

43.     E&Y was negligent in issuing the above specified January 28, 2008 reports because E&Y did not:

(a)     plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects;

(b)     obtain an understanding of internal control over financial reporting;

(c)     assess the risk that a material weakness exists;

(d)     test and evaluate the design and operating effectiveness of internal control based on the assessed risk;

(e)     recognize that the Company failed to maintain effective internal control over financial reporting as of November 30, 2007, based on the COSO criteria;

(f)     conduct its audit of the Company's financial statements as of and for the fiscal year ended November 30, 2007 in accordance with the standards of the Public Company Accounting Oversight Board (United States);

(g)     plan and perform the audit of the Company's financial statements as of and for the fiscal year ended November 30, 2007 to obtain reasonable assurance about whether the financial statements are free of material misstatement;

(h)     examine, on a test basis, evidence supporting the amounts and disclosures regarding Repo 105 transactions in the financial statements;

(i)     assess the accounting principles used and significant estimates made by management regarding Repo 105 transactions;

(j)        evaluate the impact of Repo 105 transactions on the overall financial

statement presentation.

44.        On April 8, 2008, E&Y issued a "Report of Independent Registered Public

Accounting Firm" to "The Board of Directors and Stockholders of Lehman Brothers Holdings

Inc." This report, which was reproduced in Lehman's Form 10-Q for the quarterly period ended

February 29, 2008 as filed with the SEC on April 8, 2008, stated:

> We have reviewed the consolidated statement of financial
> condition of Lehman Brothers Holdings Inc. and subsidiaries (the
> "Company") as of February 29, 2008, and the related consolidated
> statement of income for the three-month periods ended February
> 29, 2008 and February 28, 2007, and the consolidated statement of
> cash flows for the three-month periods ended February 29, 2008
> and February 28, 2007.   These financial statements are the
> responsibility of the Company's management.

> We conducted our review in accordance with the standards of the
> Public Company Accounting Oversight Board (United States). A
> review of interim financial information consists principally of
> applying analytical procedures and making inquiries of persons
> responsible for financial and accounting matters. It is substantially
> less in scope than an audit conducted in accordance with the
> standards of the Public Company Accounting Oversight Board
> (United States), the objective of which is the expression of an
> opinion regarding the financial statements taken as a whole.
> Accordingly, we do not express such an opinion.

> Based on our review, we are not aware of any material
> modifications that should be made to the consolidated financial
> statements referred to above for them to be in conformity with U.S.
> generally accepted accounting principles.

> We have previously audited, in accordance with the standards of
> the Public Company Accounting Oversight Board (United States),
> the consolidated statement of financial condition of the Company
> as of November 30, 2007, and the related consolidated statements
> of income, stockholders' equity, and cash flows for the year then
> ended and in our report dated January 28, 2008, we expressed an
> unqualified opinion on those consolidated financial statements.

45.        E&Y was negligent in issuing its April 8, 2008 report for the reasons specified in

paragraphs 38 and 43 above, and E&Y was negligent in reaffirming its January 28, 2008 report

which touted an unqualified opinion on the Company's financial statements as of and for the

year ended November 30, 2007.

46.     On July 10, 2008, E&Y issued a "Report of Independent Registered Public Accounting Firm" to "The Board of Directors and Stockholders of Lehman Brothers Holdings Inc." This report, which was reproduced in Lehman's Form 10-Q for the quarterly period ended May 31, 2008 as filed with the SEC on July 10, 2008, stated:

> We have reviewed the consolidated statement of financial condition of Lehman Brothers Holdings Inc. and subsidiaries (the "Company") as of May 31, 2008, and the related consolidated statement of income for the three and six month periods ended May 31, 2008 and 2007, and the consolidated statement of cash flows for the six month periods ended May 31, 2008 and 2007. These financial statements are the responsibility of the Company's management.
>
> We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.
>
> Based on our review, we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.
>
> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2007, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended and in our report dated January 28, 2008, we expressed an unqualified opinion on those consolidated financial statements.

47.     E&Y was negligent in issuing its July 10, 2008 report for the reasons specified in paragraph 38 and 43 above, and E&Y was negligent in reaffirming its January 28, 2008 report which touted an unqualified opinion on the Company's financial statements as of and for the year ended November 30, 2007.

48.     By no later than August 2007 (at the close of Lehman's fiscal 2007 third quarter), E&Y was provided with a "netting grid" which clearly illustrated Lehman's use of Repo 105

transactions to deceptively reduce its publicly reported net leverage and balance sheet, conceal borrowings, and increase revenue.  E&Y either negligently failed to review this "netting grid" or reviewed it and negligently failed to understand that it illustrated Lehman's use of Repo 105 transactions to effect the fraudulent financial reporting described above, and Lehman's non-disclosure to the investing public (including Plan participants) of the effect, timing, and volume of Lehman's Repo 105 activities.

49.     E&Y was also made aware of Lehman's improper use of Repo 105 transactions during its investigation of claims made by a whistleblower, Matthew Lee ("Lee"), a Senior Vice President in Lehman's Finance Division responsible for its Global Balance Sheet and Legal Entity Accounting.

50.     On June 12, 2008, Mr. Lee was interviewed by William Schlich and Hillary Hansen of E&Y. According to Hansen's notes of the interview, Mr. Lee warned E&Y about Lehman's Repo 105 practice including, notably, the enormous volume of Repo 105 activity that Lehman engaged in at quarter-end.  These notes recounted Mr. Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet at quarter-end through Repo 105 transactions and that these assets returned to the balance sheet about a week later.

51.     Instead of investigating these allegations as required by GAAS, E&Y negligently (in contravention of the Auditing Standards ("AU") sections 316, 333, 561, and 722) dismissed the foregoing information.  For example, on June 13, 2008, the day after Mr. Lee specifically informed E&Y of the $50 billion in Repo 105 transactions that Lehman undertook at the end of the second quarter 2008, E&Y spoke with Lehman's Audit Committee. Despite the fact that the Chair of the Audit Committee had clearly stated that he wanted a full and thorough investigation of every allegation made by Mr. Lee, E&Y failed to mention anything about Lehman's Repo 105

transactions. Similarly, on July 8, 2008, when the Audit Committee met with E&Y to review Lehman's fiscal 2008 second quarter financial statements, E&Y again failed to mention Mr. Lee's allegations regarding Repo 105 transactions, and stated that E&Y would issue an unqualified review report.

52.     Then, on July 22, 2008, at an Audit Committee meeting where Lehman's Head of Corporate Audit made a presentation on the results of the investigation into Mr. Lee's allegations, E&Y again failed to mention Lehman's Repo 105 transactions. At that meeting, the Audit Committee was told that "[c]orporate audit has largely completed an evaluation of [Mr. Lee's] observations in partnership with Financial Control and Ernst & Young."  In subsequent meetings and private executive sessions thereafter, E&Y also did not disclose that Mr. Lee made an allegation related to Repo 105 transactions being used to move assets off Lehman's balance sheet at quarter-end. According to the Chair of the Audit Committee, he would have expected to have been told about Lee's Repo 105 allegations.  Another Audit Committee member similarly said that the volume of Lehman's Repo 105 transactions mandated disclosure to the Audit Committee as well as further investigation.

53.     Additionally, despite the directive to investigate every claim raised by Mr. Lee, E&Y negligently failed to follow up on Mr. Lee's allegations or conduct an inquiry into the Repo 105 transactions. In fact, after E&Y's June 12, 2008 interview of Mr. Lee in which he described Lehman's moving $50 billion of inventory off its balance sheet at the end of the second quarter 2008, E&Y did not speak with Mr. Lee again. Instead, on July 10, 2008, less than four weeks after Schlich and Hansen interviewed Mr. Lee, E&Y negligently signed a Report of Independent Registered Public Accounting Firm in connection with its review of Lehman's fiscal 2008 second quarter financial statements.  This report stated that E&Y was not aware of any

material modifications that should be made to Lehman's financial statements for them to be in conformity with GAAP.  Similarly, E&Y negligently failed to amend or correct its previous fiscal 2007 reports or its more recent reports which included its report on Lehman's internal control, its audit opinion on Lehman's fiscal 2007 final financial statements, and its report on Lehman's fiscal 2008 first quarter financial statements.

54.    Professional standards required E&Y to make appropriate inquiries of management and to perform analytical procedures concerning significant transactions that occurred at the end of each interim fiscal quarter to analyze their impact upon the financial statements, including the footnotes.  Particularly after Mr. Lee alerted E&Y to $50 billion in Repo 105 transactions prior to the filing of the fiscal 2008 second quarter Form 10-Q, E&Y should have reported to senior management and the Audit Committee that Lehman was using Repo 105 transactions to temporarily and artificially reduce Lehman's balance sheet items and its net leverage ratio for reporting purposes, without disclosing the practice to the public.  E&Y knew and failed to disclose that the notes to the financial statements were false and misleading because, among other things, those notes describe all repos (including Repo 105 transactions) as "financings," which was not the case, and those notes did not disclose the Repo 105 transactions. E&Y had a professional obligation to communicate the issue to both senior management and the Audit Committee and to recommend corrections of the Forms 10-Q and, if not corrected, to issue a modified review report noting the materially inadequate disclosures.

55.    GAAS (AU Section 722) provides guidance on the nature, timing, and extent of procedures to be applied in conducting a review of interim financial information, and on the reporting applicable to such engagements.  It states that "the objective of a review of interim financial information is to provide . . . a basis for reporting whether material modifications

should be made for such information to conform with generally accepted accounting principles."

56.      GAAS (AU Section 722) also notes that a review of interim financial information necessitates: (i) the identification of the types of potential material misstatements in the interim financial information and consideration of the likelihood of their occurrence; and (ii) the selection of the inquiries and analytical procedures that will provide the accountant with a basis for reporting whether material modifications should be made for such information to conform with generally accepted accounting principles.

57.      Pursuant to GAAS (AU Section 722), a review of interim financial information "should" include analytical procedures intended to identify and investigate "relationships and individual items that appear to be unusual" through:

(a)      Comparison of the interim financial information with comparable information for the immediately preceding interim period and for corresponding previous periods;

(b)      Evaluation of the interim financial information made by consideration of plausible relationships among both financial and, where relevant, non-financial data;

(c)      Comparison of recorded amounts, or ratios developed from recorded amounts to;

- Prior periods giving consideration to known changes;

- Budgets or forecasts;

- Extrapolations from interim or annual data;

- Relationships among elements of financial information within the period;

- Information regarding the industry in which the client operates - for example, gross margin information; and

- Relationships of financial information with relevant non-financial information.

(d)     Reading the interim financial information to consider whether, on the basis of information coming to the accountant's attention, the information to be reported conforms with generally accepted accounting principles;

(e)     Inquiry of officers and other executives having responsibility for financial and accounting matters concerning:

- Whether the interim financial information has been prepared in conformity with generally accepted accounting principles consistently applied;

- Changes in the entity's accounting practices;

- Changes in the entity's business activities;

- Matters about which questions have arisen in the course of applying the foregoing procedures; and

- Events subsequent to the date of the interim financial information that would have a material effect on the presentation of such information.

58.     During the performance of its review of the Company's financial statements for the fiscal quarter ended May 31, 2008, E&Y either performed the above listed procedures and negligently failed to recognize the material magnitude of the dollar amount of the Repo 105 transactions that were used to improperly present Lehman's financial position, or negligently

failed to perform these procedures and, therefore, failed to know of them.

59.     E&Y's review reports each stated that a review of interim financial information consists principally of applying analytical procedures to financial data and of making inquiries of persons responsible for financial and accounting matters. It did not state that the reviews consisted exclusively of applying analytical procedures to financial data and of making inquiries of persons responsible for financial and accounting matters.

60.     If a review of interim financial statements were to consist solely of identification of questionable figures followed by a blind reliance on the veracity of explanations provided by those responsible for the preparation of these financial statements, then a review would constitute nothing more than a perfunctory rubber-stamping of whatever management chose to publish and disseminate to the investing public.

61.     As stated above, GAAS (AU Section 333) states that "representations from management are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion."

62.     Upon learning of the Repo 105 transactions during its interim review of Lehman's May 31, 2008 financial statements, E&Y was required by professional standards (as particularized above) to do more than simply ask Lehman's management whether or not Lehman's financial statements were prepared in conformity with GAAP.

63.     E&Y was required to employ "other procedures . . . appropriate to provide the limited assurance for a review engagement" and "a basis for reporting whether material modifications should be made for such [interim financial] information to conform with generally accepted accounting principles." *See* AU Section 722.

64.     E&Y was obligated to perform those procedures (*i.e.*, inspection of Repo 105 journal entries, inspection of Repo 105 correspondence, examination of executed Repo 105 documents, and examination of "true sale" legal opinion letters; all non-laborious tasks) which would have enabled E&Y to ascertain whether or not Lehman's accounting for and disclosure of Repo 105 transactions was appropriate.

65.     Had E&Y performed these procedures pursuant to a standard of ordinary care, E&Y could not have avoided knowing of the falsity of the Company's accounting and, thus, the falsity of the Company's financial statements during the Relevant Period.

66.     A principal purpose of the performance of a review by an auditor, as articulated by the SEC, is to "facilitate early identification and resolution of material accounting and reporting issues."

67.     The interim reviews which E&Y performed failed to "facilitate early identification and resolution of material accounting and reporting issues" because E&Y negligently failed to comply with professional standards in the conduct of its reviews of Lehman's financial statements.

68.     As stated above, the Company's financial statements which were disseminated to the investing public and to Plan members during the Relevant Period fraudulently presented fictitious leverage ratios.

69.     Since GAAS (AU Section 722) provides that a review of interim financial information "should" include analytical procedures intended to identify "relationships and individual items that appear to be unusual," had E&Y performed a review of Lehman's interim financial statements in accordance with professional standards, it could not have avoided identification of the large end of quarter Repo 105 transactions that were recorded as "sales" and

then reversed a few days later.

70.     The information required to identify the unusual high dollar one-time end of quarter Repo 105 transactions and their impact on Lehman's financial statements during the Relevant Period was highly visible to the eye of a trained auditor because this information was prominently displayed in large dollars and out of the ordinary journal entries. Moreover, this information was clearly visible in the aforementioned "netting grid" E&Y received.

71.     E&Y negligently failed to comply with professional standards as described above and, therefore, ignored large dollar end of quarter journal entries during its interim reviews, as well as during its fiscal 2007 year end audit.

72.     E&Y's January 28, 2008 report contained an opinion stating that Lehman's financial statements as of and for the fiscal year ended November 30, 2007 were presented in accordance with GAAP, and that they were audited in accordance with GAAS.

73.     GAAS (AU 411) elaborates on "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's Report." It states that the auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles should be based on judgment as to whether the:

        (a)     accounting principles selected and applied have general acceptance;

        (b)     accounting principles are appropriate in the circumstances;

        (c)     financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation;

        (d)     information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed; and

(e)     financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

74.     Lehman's financial statements as of and for the fiscal year ended November 30, 2007, which were publicly disseminated, were not presented "fairly in conformity with generally accepted accounting principles" because the:

(a)     accounting principles selected and applied did not have general acceptance;

(b)     accounting principles were not appropriate in the circumstances;

(c)     financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation; and

(d)     financial statements did not reflect the underlying events and transactions in a manner that presented the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

75.     E&Y knew that Lehman's financial statements were required to adhere to GAAP and that E&Y was responsible for performing audit procedures designed to provide reasonable assurance that they did.  E&Y failed to do so and, instead, negligently issued its unqualified opinion in a gross departure from GAAS.

76.     E&Y's negligently issued January 28, 2008 report, insofar as it stated that E&Y's audit of the Company's financial statements were conducted in accordance with GAAS, was false and misleading because the following GAAS (AU 150) were negligently violated:

(a)     General Standard No. 1 was violated, which standard requires that the examination is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

(b)     General Standard No. 3 was violated, which standard requires that due professional care is to be exercised in the performance of the examination and in the preparation of the report.

(c)     Standard Of Field Work No. 1 was violated, which standard requires that the work is to be adequately planned and assistants, if any, are to be properly supervised.

(d)     Standard Of Field Work No. 2 was violated, which standard requires that a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

(e)     Standard Of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

(f)     Standard Of Reporting No. 1 was violated, which standard requires that the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

(g)     Standard Of Reporting No. 3 was violated, which standard requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

77.     The Company was required to disclose in each of its financial statements during the Relevant Period the existence of the material facts described herein and to appropriately

report transactions in conformity with GAAP. The Company failed to make such disclosures and to account for and to report transactions in conformity with GAAP. E&Y was, therefore, required pursuant to GAAS to inform the investing public of these facts by issuance of an appropriately modified report.

78.     E&Y negligently violated GAAS in failing to express an adverse opinion on the financial statements of the Company as of and for the fiscal year ended November 30, 2007, and modified opinions on the above specified interim financial statements.

79.     GAAS (AU 316) states that the auditor should exercise:  (a) due care in planning, performing, and evaluating the results of audit procedures, and (b) the proper degree of professional skepticism to achieve reasonable assurance that material errors or irregularities will be detected.

80.     E&Y failed to comply with GAAS in that it negligently failed to perform its examinations with a proper degree of professional skepticism. In this regard, E&Y either identified and negligently ignored evidence that the Company's financial statements were materially misstated via fraudulent accounting, or negligently failed to identify such fraudulent accounting. Further, E&Y either identified and negligently ignored or negligently failed to investigate extremely questionable large dollar end of quarter transactions, and made audit judgments that no reasonable auditor would have made if confronted with the same facts.

81.     E&Y violated the provisions of GAAS (AU 311) which provides that the auditor should obtain a level of knowledge of the entity's business that will enable the auditor to plan and perform the audit in accordance with generally accepted auditing standards because that knowledge of the entity's business helps the auditor in:

(a)     Identifying areas that may need special consideration.

    (b)      Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization.

    (c)      Evaluating the reasonableness of estimates, such as valuation of inventories, depreciation, allowances for doubtful accounts, and percentage of completion of long-term contracts.

    (d)      Evaluating the reasonableness of management representations.

    (e)      Making judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures.

82.      GAAS (AU 316) requires the auditor to assess the risk of material misstatement of the financial statements due to fraud, and to perform those audit procedures that would address the identified risks.  In negligent disregard of this GAAS, in planning its audit of Lehman's fiscal 2007 financial statements, E&Y negligently ignored assessment of the risk associated with Repo 105 transactions.  Accordingly, E&Y negligently failed to audit the propriety of Lehman's recordation of Repo 105 transactions as sales.  In this regard, E&Y negligently failed to: (i) question the opinion letter which Lehman obtained from the Linklaters law firm in London, which was based upon the laws of the United Kingdom; or (ii) identify the fact that Lehman's accounting for Repo 105 transactions was contrary to GAAP (SFAS 140) and that the disclosures in Lehman's financial statements were materially false and misleading.

83.      Had E&Y undertaken the performance of those audit procedures which were required by GAAS, and with the due professional care which was required by GAAS (AU 230), E&Y would have known that the financial statements of the Company as of and for the fiscal year ended November 30, 2007, were materially false and misleading because these financial statements were not presented in accordance with GAAP.  In negligent disregard of professional

standards, E&Y failed to audit the financial statements of the Company as of and for the fiscal year ended November 30, 2007 in conformity with GAAS.

84.     GAAS (AU 150) states that: "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  E&Y negligently failed to comply with this GAAS mandate.

85.     Had E&Y confirmed the Company's Repo 105 "sales" transactions by direct communication with the purported "buyers" of Lehman's securities, inspected agreements, and reconciled purported "sales" with the Company's securities inventory records, E&Y would have learned that Lehman was not "selling" securities in its Repo 105 transactions.

86.     Had E&Y performed a non-negligent examination of subsequent cash disbursements, E&Y would have learned that the Repo 105 transactions were ordinary repo transactions.

87.     The inevitable results of having performed all of the foregoing audit procedures would have required E&Y to call all other management representations into question. As stated in GAAS (AU 333):  "If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made. Based on the circumstances, the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified."

88.     GAAS (AU 333) also states: "During an audit, management makes many representations to the auditor, both oral and written, in response to specific inquiries or through the financial statements.  Such representations from management are part of the evidential matter

the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."

89.     Based upon the foregoing GAAS, E&Y was required to perform audit procedures such as those particularized above which were necessary to corroborate management's representation that Repo 105 transactions were legitimate sales. In negligent disregard of its professional responsibilities as set forth in GAAS, E&Y failed to corroborate management's representations that Repo 105 transactions were sales.

## THE PLAN INCORPORATES SEC FILINGS

90.     The following documents, previously filed by the Company with the Securities and Exchange Commission ("SEC") pursuant to the Securities and Exchange Act ("Exchange Act"), are incorporated by reference into the Plan's Summary Plan Description ("SPD"):

> The Company's Annual Report on Form 10-K for the fiscal year ended November 30, 2006, filed with the Commission on February 13, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2006, filed with the Commission on October 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended May 31, 2006, filed with the Commission on July 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2006, filed with the Commission on April 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Current Report on Form 8-K, filed with the Commission on February 9, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 31, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 19, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 29, 2006 pursuant to Section 13 or

15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 21 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 14, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 7, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December I, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 22, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 2, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 3, 2006

pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 30, 2004 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 23, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the

Company's Current Report on Form 8-K, filed with the Commission on January 17, 2006 pursuant to Section 13 or 15(d) of the Exchange Act.

*See* SPD pp. 22-23 (attached hereto as Exhibit A).

91.     Each of the documents cited in this Complaint were filed by Lehman with the

SEC pursuant to the Exchange Act and were incorporated by reference into the SPD:

In addition, each other document filed by the Company or by the Plan pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act ***after the date of this booklet and prior to the termination of the Company's offering of Plan interests and common stock in connection with the Plan shall be automatically incorporated by reference into this booklet and constitute part of the aforementioned prospectus from the date of filing of such document.*** In the event of any inconsistency between any information in this booklet and any document incorporated by reference, the latest information shall prevail and shall be deemed to replace any prior inconsistent information.

*See id.* (Emphasis added).

92.     On September 15, 2008, Lehman filed a voluntary petition for relief under

Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern

District of New York.  The case is captioned *In re Lehman Brothers Holdings Inc., et al.*, Civ.

No. 08-13555 (JMP).

93.     On September 17, 2008, the New York Stock Exchange ("NYSE") announced the

immediate suspension of trading of Company stock.  Lehman Stock now trades over the counter

for less than 10 cents a share.

94.     In the bankruptcy proceedings, the Bankruptcy Court appointed the Examiner to

"file a statement of . . . any fact ascertained pertaining to fraud, dishonesty, incompetence,

misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to

a cause of action available to the estate."

95.     On March 11, 2010, the Examiner issued his report pursuant to the Bankruptcy

Court's Order, concluding, among other things, that sufficient evidence exists to support

colorable claims against E&Y "for professional malpractice . . . ."  Valukas Report at 1027.

Specifically, the Examiner determined that:

> ***sufficient evidence exists to support at least three colorable claims that could be asserted against Ernst & Young relating to Lehman's Repo 105 activities and reporting***: (1) negligence in connection with the investigation into whistleblower Matthew Lee's claims concerning $50 billion in Repo 105 activities at the end of the second quarter 2008, including failing to conduct an adequate  inquiry into the allegations prior to the filing of Lehman's Form 10-Q, and failing to properly inform management and the Audit Committee of Lee's allegations; (2) at least with respect to Lehman's first quarter and second quarter 2008 Forms 10-Q, if not with respect to earlier filings, negligence by failing to take proper action when Ernst & Young was made aware that the financial information may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on interim financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Forms 10-Q for these quarters; and (3) at least with respect to Lehman's 2007 Form 10-K, if not with respect to earlier Forms 10-K, negligence by failing to take proper action when Ernst & Young was made aware that the financial statements may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Form 10-K.

*Id*. at 1032-33 (footnotes omitted) (emphasis added).

## INJURY TO THE PLAN

96.    The Company Stock Fund is one of the investment options available for Plan participants.  In its 2007 Form 11-K, filed on June 26, 2008, Lehman reported that the Plan had approximately $228,691,000 invested in the Company Stock Fund as of December 31, 2007, when Company Stock was trading at $65.44 per share.

97.    As a consequence of E&Y's negligently conducted audits, as specified in paragraphs 21 to 89 above, the Plan suffered substantial losses, resulting in the depletion of millions of dollars from the retirement savings and anticipated retirement income of the Plan's participants.

98.     E&Y knew that the that the Lehman SEC filings containing the audited financial statements were incorporated by reference into the Plan's SPD and, therefore, would be, and were, relied upon by Plan participants because from 2000 through 2006, E&Y also provided audit services to the Plan.   As the previous auditor of the Plan, E&Y knew that Lehman's periodic SEC filings containing audited financial statements were incorporated by reference into the Plan's SPD and, therefore, relied upon by Plan participants.   Accordingly, E&Y knew that Lehman's audited financial statements, which were included in Lehman's publicly filed documents during the Relevant Period, would be, and were, relied upon by Plan participants.

## **BREACH OF FIDUCIARY DUTIES ALLEGATIONS**

99.     Plaintiffs bring this action against Fidelity under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).   Section 502(a)(2), 29 U.S.C. § 1132(a)(2), states that "[a] civil action may be brought -- " "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"   ERISA Section 409(a), 29 U.S.C. § 1109(a), states that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary*, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

100.     As noted above, Fidelity, as Trustee of the Plan, owes the Plan the fiduciary duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

101.    Despite its fiduciary duty to do so, Fidelity failed to undertake any action to recover losses to the Plan caused by E&Y's negligence in performing its audits of Lehman during the Relevant Period.  Indeed, even after the March 11, 2010 issuance of the Valukas Report, in which the Examiner concluded, among other things, that E&Y was negligent in conducting its audits of Lehman during the Relevant Period, Fidelity undertook no action against E&Y.

102.    On July 6, 2010, Plaintiffs made a demand on Fidelity to initiate an action against E&Y.  *See* Exhibit B attached hereto.  On August 4, 2010, Fidelity responded (attached hereto as Exhibit C); however, Fidelity has not taken action as of the date of the filing of this Complaint.

103.    In addition, Fidelity is a named defendant in the pending ERISA action entitled

104.    Fidelity's failure to take any action against Lehman for almost six months after the issuance of the Valukas Report, and for more than two months after Plaintiffs' demand, constitutes a breach of the fiduciary duties it owes to preserve and maintain all Plan assets.

105.    Further, Fidelity's failure to act against E&Y for more than two months after the demand by Plaintiffs constitutes a refusal of Plaintiffs' demand.

## FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY TO PRESERVE AND MAINTAIN PLAN ASSETS
#### (Claim Against Defendant Fidelity)

106.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

107.    Defendant Fidelity, as Trustee, owes the Plan, its participants and beneficiaries the fiduciary duty to preserve and maintain Plan assets.  This duty includes enforcing valid claims held by the Plan.

108.    Nonetheless, Fidelity took no action against E&Y based on the March 11, 2010

issuance of the Valukas Report by the Examiner in Lehman's bankruptcy proceedings, even though the Examiner concluded, among other things, that "*sufficient evidence exists to support colorable claims against Ernst & Young LLP . . . for professional malpractice* arising from Ernst & Young's failure to follow professional standards of care with respect to communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings."

109.    Further, despite the fact that Plaintiffs issued a demand upon Fidelity to take action to pursue claims on behalf of the Plan against E&Y based on E&Y's negligent audits of Lehman during the Relevant Period, Fidelity has failed to do so.

110.    Fidelity's failure to take any action whatsoever to enforce the Plan's valid claim against E&Y for professional malpractice in connection with E&Y's audits of Lehman during the Relevant Period, constitutes a breach of the fiduciary duties that Fidelity owes to the Plan. As a consequence of this breach, the Plan suffered losses.

111.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

## SECOND CAUSE OF ACTION

### PROFESSIONAL MALPRACTICE
**(Trust Beneficiaries' Derivative Claim under New York Law on Behalf of the Plan Against Defendant E&Y)**

112.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

113.    Plaintiffs, as participants in the Plan, are beneficiaries of a trust under New York Law who may derivatively seek relief on behalf of the Plan against E&Y because the trustee,

Fidelity, has refused to act upon Plaintiffs' demand that Fidelity seek such relief on behalf of the Plan.

114.    Plaintiffs made a written demand upon Fidelity to take action against E&Y for the losses to the Plan caused by E&Y's negligent audits of Lehman during the Relevant Period, but Fidelity has taken no action with respect to, and has thereby refused, that demand.

115.    Defendant E&Y owed a duty of care to Lehman to exercise that degree of skill normally expected of accountants performing auditing services for public companies.   In performing audits for Lehman during the Relevant Period, however, E&Y failed to exercise the degree of care, skill, and competence exercised by competent members of the accounting profession as alleged above.   Lehman subsequently declared bankruptcy as a result of Lehman's significant debt and accounting irregularities that were not disclosed by Defendant E&Y's negligent audit.

116.    Further, due to the fact that E&Y served as auditor of the Plan from 2000 through 2006, it knew that the audited financial statements included in the Lehman public filings during the Relevant Period would be incorporated into the Plan's SPD and, therefore, would be and were relied upon by participants and beneficiaries of the Plan.

117.    The Plan has suffered actual damages as a result of being funded with Lehman Stock in a financially unstable, and now bankrupt entity.

118.    Defendant E&Y is liable for all losses to the Plan as a result of the afore-described violations of its professional duties and negligence.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.      An Order compelling Defendant E&Y to make good to the Plan all losses resulting from Defendant E&Y's negligence and professional malpractice in the audits of Lehman during the Relevant Period, and to restore to the Plan all profits which the participants would have made if E&Y had fulfilled its professional obligations in conducting those audits;

B.      Imposition of a Constructive Trust on any amounts by which Defendant was unjustly enriched at the expense of the Plan as the result of its negligence;

C.      Actual damages in the amount of any losses the Plan suffered as a consequence of Fidelity's breach of fiduciary duties in failing to initiate action against E&Y in order to enforce valid claims by the Plan against E&Y based upon E&Y's negligent audit of Lehman during the Relevant Period;

D.      An Order awarding attorney' fees; and

E.      An Order for equitable restitution and other appropriate equitable relief against Defendant E&Y.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 20, 2010

**GILMAN AND PASTOR, LLP**

By: /s/ David Pastor_____
        David Pastor (BB0# 391000)
        63 Atlantic Avenue, 3rd Floor
        Boston, MA 02110
        Telephone: (617) 742-9700
        Facsimile: (617) 742-9701
        Email: dpastor@gilmanpastor.com

*EGLESTON LAW FIRM*
Gregory M. Egleston
360 Furman Street, Suite 443
Brooklyn, NY 11201
Telephone: (646) 227-1700
Facsimile: (646) 227-1701
Email: egleston@gme-law.com
       greg.egleston@gmail.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rigrodskylong.com
Email: bdl@rigrodskylong.com

-and-

Timothy J. MacFall
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Telephone (516) 683-3516
Email: tjm@rigrodskylong.com

*Attorneys for Plaintiffs*